746 A.2d 5

COUNTY OF HUDSON, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, JUVENILE JUSTICE COMMISSION, PAUL DONNELLY, EXECUTIVE DIRECTOR OF THE JUVENILE JUSTICE COMMISSION, STATE OF NEW JERSEY, DEPARTMENT OF CORRECTIONS, PETER G. VERNIERO, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

COUNTY OF CAMDEN, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, JUVENILE JUSTICE COMMISSION, PAUL DONNELLY, EXECUTIVE DIRECTOR OF THE JUVENILE JUSTICE COMMISSION, STATE OF NEW JERSEY, DEPARTMENT OF CORRECTIONS, PETER G. VERNIERO, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 16, 1999—Stayed by the Order of June 30, 1999
until end of Legislative session—Resubmitted January 11, 2000
at the end of 208th Legislative session—Decided February 10, 2000.

Before Judges KING, WALLACE and NEWMAN.

*Michael A. Cifelli*, Assistant Hudson County Counsel and *Donna M. Whiteside*, Assistant Camden County Counsel, argued the cause for appellants (*Francis DeLeonardis*, Hudson County Counsel and *Robert G. Millenky*, Camden County Counsel, attorneys; *Mr. Cifelli* and *Ms. Whiteside*, on the joint brief).

*John Franzini*, Deputy Attorney General, argued the cause for respondents (*John J. Farmer, Jr.*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Mr. Franzini*, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

I

This case involves the validity of a regulation promulgated by the Juvenile Justice Commission providing for a forty-five-day transfer period for State-sentenced juveniles housed in county correctional facilities and detention centers. The Juvenile Justice Commission (JJC) was created on December 15, 1995 by the Legislature as a result of recommendations of the Governor's Advisory Council on Juvenile Justice. 30 *N.J.R.* 871 (March 2, 1998). Prior to establishing the JJC, three state agencies, the Department of Corrections, the Department of Law and Public Safety, and the Department of Human Services, were responsible for operating the juvenile justice system. *N.J.S.A.* 52:17B–169d. The JJC was created, pursuant to *N.J.S.A.* 52:17B–170a, "in, but not of, the Department of Law and Public Safety" because the legislature found the most efficient and effective use of resources required fixing responsibility for a comprehensive juvenile justice program in a single State agency. *N.J.S.A.* 52:17B–169j.

In creating the JJC, the Legislature established a single State agency "responsible for developing a Statewide plan for effective provision of juvenile justice services and sanctions at the State, county and local level...." *N.J.S.A.* 52:17B–169k. Pursuant to *N.J.S.A.* 52:17B–176 titled "Juveniles, facilities and programs to be transferred to Juvenile Justice Commission," the Legislature gave the JJC all the powers and responsibilities previously held by the three agencies which had been responsible for the juvenile justice system.

The Legislature also charged the JJC to establish standards (1) for the "care, treatment, government, and discipline of juveniles" adjudicated delinquent, pursuant to *N.J.S.A.* 52:17B–170e(6); (2) to assume the custody and care of juveniles committed to it by law pursuant to *N.J.S.A.* 52:17B–170e(7); (3) to formulate and adopt standards and rules for the efficient running of the Commission and its facilities pursuant to *N.J.S.A.* 52:17B–170e(14); and (4) to promulgate rules and regulations necessary to effectuate the purposes of the Commission, *N.J.S.A.* 52:17B–170e(22). *See County of Hudson v. Department of Corrections,* 152 *N.J.* 60, 67, 703 *A.*2d 268 (1997). In the JJC's enabling legislation, the Legislature provided for the continuation of any regulations promulgated by the agencies other than Law and Public Safety previously responsible for the juvenile justice system. *N.J.S.A.* 52:17B–177b(3) provides as follows:

> All rules and regulations promulgated by the Commissioner of Corrections or the Commissioner of Human Services pertaining to functions, powers, duties and authority transferred to the commission pursuant to [52:17B–176] shall be considered rules or regulations of the commission and, as such, shall remain in full force and effect until expiration or modification by the commission in accordance with law.

At that time, pursuant to *N.J.A.C.* 10:19–4.2(d), the State was required to transfer all State-sentenced juveniles to the intake unit of the New Jersey Training School within three days after the Department of Corrections was notified about a sentenced juvenile offender. In many counties the State did not comply with this three-day transfer regulation.

On May 2, 1997 we decided *County of Hudson v. Department of Corrections*, 300 *N.J.Super.* 389, 391, 693 *A.*2d 146 (App.Div.1997), in which the Counties of Hudson and Camden had filed suit against the State of New Jersey, JJC, for its failure to remove State-sentenced juvenile offenders from County Youth Detention Centers within three days after sentencing pursuant to *N.J.A.C.* 10:19–4.2. We held that *N.J.A.C.* 10:19–4.2 was a valid regulation; we found there was no legitimate reason for the State to continue its noncompliance with the regulation, and we ordered the State to remove State-sentenced juveniles within the three-day time period. *Id.* at 394, 693 *A.*2d 146. On December 10, 1997, in *County of Hudson v. Department of Corrections*, 152 *N.J.* 60, 65, 703 *A.*2d 268 (1997), the Supreme Court affirmed our decision and upheld the validity and enforceability of the transfer regulation, *N.J.A.C.* 10:19–4.2.[1]

On February 3, 1998 the Executive Board of the JJC, including Peter Verniero, then the Attorney General and Chair of the JJC, adopted, on an emergency basis pursuant to *N.J.S.A.* 52:14B–4c and *N.J.S.A.* 52:17B–170, a recodification and amendment of *N.J.A.C.* 10:19–4.2(d) and (e) as *N.J.A.C.* 13:90–4.2, in effect, a new regulation. The recodification with amendment and the new regulation provided forty-five days to transfer State-sentenced juveniles from county detention facilities to a State facility.

On April 2, 1998 the JJC Executive Board adopted the proposed recodification with amendment of *N.J.A.C.* 10:19–4.2(d) and (e) as *N.J.A.C.* 13:90–4.2 which provided for a forty-five-day transfer

---

[1] *N.J.A.C.* 10:19–4.2 (now replaced by *N.J.A.C.* 13:90–4.2) provided, in pertinent part, the following:

> (d) A juvenile who receives a State sentence of incarceration shall be transported to the juvenile intake unit at the New Jersey Training School for Boys no later than *three working days* after the Department of Corrections receives notification, . . . .
>
> (e) The county official who is responsible for transporting the juvenile shall contact the New Jersey Department of Corrections, Division of Juvenile Services, to ascertain the date on which such transfer may be effected. (Emphasis added).

period. On April 3, 1998 the recodification with amendment and the new rule were filed with the Office of Administrative Law and became effective.

On April 8, 1998 Hudson County filed a notice of appeal challenging the recodification with amendment and the new regulation. *R.* 2:2–3(a)(2). On April 15, 1998 Camden County filed a similar notice of appeal. We consolidated the appeals.

## II

Hudson and Camden Counties (the Counties) raise three claims on this appeal: (1) *N.J.A.C.* 13:90–4.2 is an invalid regulation which illegally shifts the burden of housing State-sentenced juveniles to the counties; (2) *N.J.A.C.* 13:90–4.2 exceeds the statutory authority set forth in *N.J.S.A.* 52:17B–170 and conflicts with *N.J.S.A.* 2A:44.1 and *N.J.S.A.* 2A:4A–37, and (3) *N.J.A.C.* 13:90–4.2 is unconstitutional and violates due process rights of sentenced juvenile offenders. We find the new regulation allowing up to forty-five days for transfer to a State facility valid and within the rule-making authority of the JJC.

This is the background of this dispute between the State and the appellant counties. After we decided *County of Hudson v. Department of Corrections* on May 2, 1997, the JJC proposed a new version of *N.J.A.C.* 13:90–4.2, eliminating the three-day transfer rule and providing a sixty-day transfer period for 1997, a forty-five-day transfer period for 1998 and a thirty-day transfer period for 1999 and after. 29 *N.J.R.* 1667–1668 (May 5, 1997). On June 2, 1997 Mark J. Lonetto, the Camden County Administrator and Treasurer, wrote to Paul Donnelly, Executive Director of the JJC. In this correspondence, Lonetto stated the attempt on the part of the State to shift the burden of caring for State-sentenced juveniles on Camden County was a "blatant" violation of the existing statutory mandates. Lonetto's correspondence included an affidavit of Mary Previte, Administrator of the Camden County Youth Center. In the affidavit Previte stated that the overcrowding of the Youth Center had resulted in assaults and injury to vulnerable

juveniles within the Center. One example occurred where more powerful juveniles sodomized a younger, vulnerable juvenile. Previte stated that overcrowding combined with the mixture of State-sentenced and non-sentenced juveniles was "dangerous." Previte also stated the Youth Center in Camden County was beyond its capacity: designed to hold about thirty-seven juveniles, about sixty-six were in the facility as of November 21, 1996. Previte also stated the prolonged overcrowding of the County Youth Center associated with State-sentenced juveniles created institutional tension resulting in fighting among the juveniles and a sense of fear in the staff.

On December 10, 1997, in *County of Hudson v. Department of Corrections*, the Supreme Court affirmed our judgment and upheld the validity and enforceability of the extant transfer regulation, *N.J.A.C.* 10:19–4.2, 152 *N.J.* at 65, 703 *A.2d* 268. Except for the Counties of Hudson and Camden, the Court stayed its judgment for sixty days from the date of the decision. This enabled the State to take measures to comply with the three-day time-period transfer regulation, unless the regulation was modified or superseded by a valid amendment. The Court stated that, although the State was required to comply with its own regulation, nothing foreclosed the State from amending, changing or repealing its regulations, especially in response to changing conditions, pursuant to the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15, which provides the manner in which an agency can amend an existing regulation. 152 *N.J.* at 72, 703 *A.2d* 268. The Court also suggested that the State could adopt an emergency regulation upon the finding of "imminent peril to the public health, safety, or welfare" pursuant to *N.J.S.A.* 52:14B–4c. *Id.* at 73, 703 *A.2d* 268. The Court said that an emergency regulation would be effective for only a limited time period but that it would give the JJC more time to address the problem. *Ibid.* Another alternative proposed by the Court was for the State to enter into agreements with the counties to prevent overcrowding, pursuant to *N.J.S.A.* 2A:4A–44.1. *Ibid.*

On February 3, 1998 the Executive Board, including Peter Verniero, as Attorney General and Chair, adopted, on an emergency basis pursuant to *N.J.S.A.* 52:14B–4c and *N.J.S.A.* 52:17B–170, a recodification and amendment of *N.J.A.C.* 10:19–4.2(d) and (e), *N.J.A.C.* 13:90–4.2. 30 *N.J.R.* 871 (March 2, 1998). Emergency regulation *N.J.A.C.* 13:90–4.2, in pertinent part, provided:

> (a) Consistent with the purpose set forth by the Legislature in the juvenile justice reform legislation to reduce overcrowding at all State and county juvenile facilities, a juvenile who receives a State sentence of incarceration shall be transported to the juvenile intake unit at the New Jersey Training School for Boys *no later than 45 days* after the Juvenile Justice Commission receives notification, in the form of a signed commitment order and a presentence or predisposition report, from the county where the juvenile has been sentenced. Subject to the availability of appropriations, the Commission also shall provide a Commission-determined per diem rate to the counties for State-committed juveniles held in the county detention centers from the 16th day after receipt by the Commission of the signed commitment order and presentence or predisposition report for each State-sentenced juvenile. The per diem rate shall be established by the Commission from time to time. The 45 days shall be exclusive of the date on which the Commission receives the appropriate and necessary documentation.
>
> [30 *N.J.R.* 871 (March 2, 1998)(emphasis added).]

The emergency status of the recodification, amendment and new rule was set forth in a "Certification of Imminent Peril" by Governor Whitman and a "Statement of Imminent Peril" by Peter Verniero, as Attorney General and Chair, Juvenile Justice Commission. The Attorney General's "Statement of Imminent Peril" said that unless the JJC implemented the emergency regulation, compliance with the original three-day rule would have been necessary and would create "operational instability, and have a negative effect upon the safety and security of staff, the juveniles, and the public, thereby generating the imminent peril sought to be avoided by the emergency adoption of this rule." The Attorney General's statement claimed there were, at that time, ninety-two State-sentenced juveniles in county detention centers. The Attorney General stated the JJC has resources available for medical and psychological evaluations for twenty to twenty-five juvenile admissions per week but an increase to ninety-two admissions, coupled with adherence to the application of a three-day rule, would strain the classification process and harm the juveniles at the State level. The Attorney General further stated the physical

plant of the Training School could accommodate a capacity of 404 but the daily population was about 490. He concluded the risk of institutional instability escalates as the population of the institution increases, creating a greater potential for incidents among juveniles and between juveniles and staff, again at the State level. The Attorney General concluded by claiming the forty-five-day holding period could provide appropriate placement for each individual offender while addressing the issue of State overcrowding.

On February 23, 1998 Camden County Counsel Robert Millenky wrote to JJC Director Donnelly stating the emergency rule proposed by the JJC violated *N.J.S.A.* 2A:4A–37c,[2] providing no juvenile may be placed in a detention facility which has reached its maximum capacity; *N.J.S.A.* 2A:4A–43c(2),[3] requiring an agreement between the JJC and the County for such placement; and *N.J.S.A.* 2A:4A–44.1,[4] providing the JJC may enter into an agree-

---

[2] *N.J.S.A.* 2A:4A–37c states, in pertinent part: "No juvenile shall be placed in a detention facility which has reached its maximum population capacity, as designated by the Juvenile Justice Commission".

[3] *N.J.S.A.* 2A:4A–43(c) states:

(2) No juvenile may be incarcerated in any county detention facility unless the county has entered into an agreement with the Juvenile Justice Commission concerning the use of the facility for sentenced juveniles. Upon agreement with the county, the Juvenile Justice Commission shall certify detention facilities which may receive juveniles sentenced pursuant to this subsection and shall specify the capacity of the facility that may be made available to receive such juveniles; provided, however, that in no event shall the number of juveniles incarcerated pursuant to this subsection exceed 50% of the maximum capacity of the facility.

[4] *N.J.S.A.* 2A:4A–44.1 states:

The Juvenile Justice Commission established pursuant to section 2 of P.L.1995, c. 284 (C. 52:17B–170) may enter into an agreement with any county concerning the use of that county's juvenile detention facility for the housing of juveniles the court has placed under the custody of the commission for placement in State correctional facilities only if the county's juvenile detention facility is not over its maximum rated capacity.

Unless the contract otherwise provides or the commission so directs in order to provide for the secure and orderly operation of the facility, a

ment with the county to place State-sentenced juvenile offenders in county facilities. Millenky's letter also asserted that the forty-five-day regulation was an ill-advised State attempt to shift the statutory housing responsibility of juveniles from the State to the counties. On February 27, 1998 Director Donnelly sent a response to Millenky's letter stating Millenky's assertions that the State was shifting the burden of housing State-sentenced juveniles on the county were without merit. Donnelly stated that there was no violation of *N.J.S.A.* 2A:4A–37c as this statute applied to the counties. Donnelly also stated the emergency rule did not provide for the placement of State-sentenced juveniles in the county facilities but rather described a "transfer" period. Donnelly stated that *N.J.S.A.* 2A:4A–43c(2) was not violated by the regulation because this "agreement" provision did not conflict with the regulation which addressed the transfer of State-sentenced juveniles from county detention facilities.

On March 11, 1998 Director Donnelly also wrote to Mary Previte stating that based on her own correspondence (a letter dated February 10, 1998 from Previte to Donnelly), State-sentenced juveniles comprised only a small portion of the total population at the Camden County Youth Center. Donnelly further claimed that since the effective date of the emergency regulation, the State had transferred twenty juveniles from the Camden County Youth Center within thirteen days or less. Donnelly also asserted Camden County has had a long-standing overcrowding condition which has been exacerbated by the county's failure to take advantage of alternative programs such as In–Home Detention Program.

---

juvenile placed in a county detention facility pursuant to the provisions of this act shall not be segregated from the juveniles otherwise placed in the county detention facility or excluded from any program or activity offered in that facility.

Any contract entered into pursuant to this section shall ensure that educational, vocational, mental health, health and rehabilitative services are provided to the juveniles and that these services are, at minimum, equivalent to those provided to adjudicated juveniles in State-operated facilities.

On March 20, 1998 Director Donnelly received additional correspondence from Abraham Antun, Acting Administrator of Hudson County. In the letter, Antun stated the regulation promulgated by the JJC would result in an added financial burden on Hudson County and make it difficult for the county to educate detained but non-adjudicated juveniles. Antun also stated the regulation would diminish the county's ability to provide counselling, recreational, religious, and general rehabilitative services for juveniles. Antun said the forty-five-day transfer regulation was a circumvention of the legislative prohibition of shifting the burden of housing State-sentenced juveniles from State to county facilities.

On March 24, 1998 Mary Previte contacted Director Donnelly by letter in response to Donnelly's March 11, 1998 letter. Previte stated Donnelly's calculation of State-sentenced juveniles in Camden County's Youth Center was an average over several years and did not accurately reflect present conditions. Previte also stated Camden County was already taking significant steps to reduce its population in the Youth Center and that inadequate State services in the areas of the Division of Youth and Family Services (DYFS) and probation services were a large part of the Youth Center overcrowding problem. On March 26, 1998 the Board of Chosen Freeholders of Hudson County passed a resolution in opposition to the JJC's emergency adoption of and proposed amendments to *N.J.A.C.* 10:19–4.2(d) and (e) and the proposed enactment of *N.J.A.C.* 13:90–4.2.

On April 2, 1998 the Executive Board of the JJC, with Attorney General Verniero as Chair, adopted the proposed recodification with amendment of *N.J.A.C.* 10:19–4.2(d) and (e) as *N.J.A.C.* 13:90–4.2. 30 *N.J.R.* 1619 (May 4, 1998). On April 3, 1998 the recodification with amendment and new rule were filed with the Office of Administrative Law and became effective on the date of the filing. *Ibid. N.J.A.C.* 13:90–4.2 as adopted on April 3, 1998 provided,

> (a) Consistent with the purpose set forth by the Legislature in the juvenile justice reform legislation to reduce overcrowding at all State and county juvenile facilities, a juvenile who receives a State sentence of incarceration shall be

transported to the juvenile intake unit at the New Jersey Training School for Boys *no later than 45 days* after the Juvenile Justice Commission receives notification, in the form of a signed commitment order and a presentence or predisposition report, from the county where the juvenile has been sentenced. Subject to the availability of appropriations, the Commission also shall provide a Commission-determined per diem rate to the counties for State-committed juveniles held in the county detention centers from the 16th day after receipt by the Commission of the signed commitment order and presentence or predisposition report for each State-sentenced juvenile. The per diem rate shall be established by the Commission from time to time. *The 45 days shall be exclusive of the date on which the Commission receives the appropriate and necessary documentation.*

[Emphasis added.]

On April 2, 1998 Senate Concurrent Resolution No. 46 (SCR 46) was introduced pursuant to *N.J. Const.* art. V, § 4, ¶ 6,[5] the so-called "legislative veto" provision. *See In re the Adoption of Regulations Governing the State Health Plan,* 135 *N.J.* 24, 28, 637 *A.2d* 1246 (1994). On April 20, 1998 Assembly Concurrent Resolution No. 91 (ACR 91) was also introduced pursuant to *N.J. Const.*

---

[5] 6. Rules and regulations; filing; publication; legislative review.

6. No rule or regulation made by any department, officer, agency or authority of this State, except such as relates to the organization or internal management of the State government or a part thereof, shall take effect until it is filed either with the Secretary of State or in such other manner as may be provided by law. The Legislature shall provide for the prompt publication of such rules and regulations. The Legislature may review any rule or regulation to determine if the rule or regulation is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement. Upon a finding that an existing or proposed rule or regulation is not consistent with legislative intent, the Legislature shall transmit this finding in the form of a concurrent resolution to the Governor and the head of the Executive Branch agency with promulgated, or plans to promulgate, the rule or regulation. The agency shall have 30 days to amend or withdraw the existing or proposed rule or regulation. If the agency does not amend or withdraw the existing or proposed rule or regulation, the Legislature may invalidate that rule or regulation, in whole or in part, or may prohibit that proposed rule or regulation, in whole or in part, from taking effect by a vote of a majority of the authorized membership of each House in favor of a concurrent resolution providing for invalidation or prohibition, as the case may be, of the rule or regulation. This vote shall not take place until at least 20 calendar days after the placing on the desks of the members of each House of the Legislature in open meeting of the transcript of a public hearing held by either House on the invalidation or prohibition of the rule or regulation.

art. V, § 4, ¶ 6. Both resolutions, SCR 46 and ACR 91, declared that *N.J.A.C.* 13:90–4.2 had exacerbated overcrowding problems of juvenile detention centers and was inconsistent with the legislative intent of *N.J.S.A.* 2A:4A–20 to –91. The resolutions also declared that the per diem reimbursement rate of $58.50 which a county would receive from the State after the fifteenth day of a juvenile's detention in the county facility was insufficient. SCR 46 was referred to the Senate Legislative Oversight Committee on April 2, 1998 and was reported out of Committee with non-substantive amendments on November 23, 1998.

We heard oral argument in this matter on June 16, 1999. Aware of the pending legislative activity, we nonetheless entertained oral argument but then decided to delay any decision for a reasonable time in deference to the Legislature. Shortly after oral argument, on June 24, 1999, the Senate unanimously adopted SCR 46 by a 40–0 vote. Again, in deference to the legislative process, we filed this order on June 30, 1999:

> THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS 30TH DAY OF JUNE, 1999 HEREBY ORDERED AS FOLLOWS:
>
> In view of the passage of Senate Concurrent Resolution No. 46 on June 24, 1999, we defer rendering a decision in this matter, argued before us on June 16, 1999. We will await further action on the validity of *N.J.A.C.* 10:19–4.2 by the Legislature and the Executive, noting that Concurrent Resolution No. 46 found that the regulation "is not consistent with legislative intent" and transmitted a copy of the concurrent resolution to the Governor and the Director of the Juvenile Justice Commission for action within 30 days pursuant to Article V, Section IV, paragraph 6 of the Constitution of the State of New Jersey.
>
> If any party desires reargument, further briefing, or other relief upon the conclusion of the constitutional process described in Article V, Section IV, paragraph 6, within 30 days thereafter that party may make an appropriate application by motion to the Presiding Judge of Part B.

We then awaited action by the General Assembly on ACR 91; it never emerged from the Assembly Oversight Committee and ACR 91 died when the legislative session ended on January 10, 2000. The attempted "legislative veto" process did not succeed. We therefore must decide the validity of recodified *N.J.A.C.* 13:90–4.2 providing for a forty-five-day transfer period from county deten-

tion facilities to a State facility for State-sentenced juvenile offenders.

In a very recent development, on January 21, 2000 the Attorney General, John J. Farmer, Jr. advised us in writing as follows about *N.J.A.C.* 13:90–4.2, which is "due to expire on May 12, 2000":

Please be advised that at this meeting on January 19, 2000, the Executive Board of the Juvenile Justice Commission authorized a proposal to amend the existing 45–day transfer regulation set forth at *N.J.A.C.* 13:90–4.2.

The proposal is to reduce the maximum number of days within which transfer must be made from 45 days to 30 days and to recodify the rule to *N.J.A.C.* 13:92–4.2. There are no other proposed changes to *N.J.A.C.* 13:90–4.2. It is anticipated that the proposal will be published in the *New Jersey Register* on February 22, 2000. A copy of the Notice of Proposal is attached for your review."

We attach the "agency proposal" as Appendix A. The proposal explains the Executive branch's continuing efforts in respect of the "transfer" problem.

### III

The Counties contend that *N.J.A.C.* 13:90–4.2 is without legislative authority and improperly shifts the burden of housing State-sentenced juveniles from the State to the counties. The Counties argue that while this court in *County of Hudson v. Department of Corrections* found that the State may house juveniles in County facilities for a "transfer period," the current regulation is in essence an unauthorized "housing" period. The Counties assert that pursuant to *N.J.S.A.* 52:17B–170e(7) the State is responsible for the custody and care of juveniles committed by the family court. Despite this responsibility, the Counties argue the State is wrongly imposing additional overcrowding at county facilities. The Counties also argue it is possible for a juvenile to spend the entire "sentence" in the county facility depending upon the severity of their crime (*e.g.*, crime of automobile theft with only a thirty-day period of imprisonment). As a result, the Counties assert that the forty-five-day "transfer period," really a housing period, will exacerbate the overcrowding in county facilities. The Counties also argue that the regulation imposing a forty-five-day transfer period is invalid on its face despite the regulation's provision

for per diem payments for housing a State-sentenced juvenile beyond fifteen days. The Counties assert that the cost per diem of housing a juvenile is $224 and the State's suggested amount of $58.50 per day is woefully insufficient. Lastly, the Counties contend that the regulation is nonetheless invalid despite any undocumented State claims that juveniles now are transferred within an average fifteen-day time period.

The State counters that *N.J.A.C.* 13:90–4.2 providing a forty-five-day holding period is a valid regulation which controls overcrowding in State juvenile facilities while maintaining the State's responsibility to house State-sentenced juveniles. The State also asserts that the regulation does not unreasonably shift the burden of housing State-sentenced juveniles to the Counties. Under *N.J.S.A.* 2A:4A–43c, the State argues the Juvenile Detention Commitment Program is a sensible alternative to sentencing a juvenile up to 60 days to a State facility provided that the county participates in the program. In the event the county does not, the juvenile must then be sentenced to the State correctional facility. The State maintains that it does not unreasonably shift the burden of housing State-sentenced juveniles beyond the controlling statutory authority. The State also argues that the regulation is valid on its face despite the contention the State's per diem payment for the housing of State-sentenced juveniles is insufficient.

██ Administrative regulations are accorded a presumption of validity. *New Jersey State League of Municipalities v. Department of Community Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999) (citing *In re Township of Warren,* 132 *N.J.* 1, 26, 622 *A.*2d 1257 (1993); *Medical Soc'y v. New Jersey Dep't. of Law & Pub. Safety,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990)). The party challenging their validity bears the burden of proving that the regulations are arbitrary, capricious, or unreasonable. *Ibid.* (citing *In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 543–44, 575 *A.*2d 481 (1990); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978)). Judicial deference to administrative agencies stems from the recognition that agencies have the

specialized expertise necessary to enact regulations dealing with technical matters and are "particularly well equipped to read and understand ... technical issues that ... rulemaking would invite." *Ibid.* (quoting *Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.*, 96 *N.J.* 456, 474, 476 *A.*2d 784 (1984)). Therefore, the scope of review of administrative regulations is "highly circumscribed," and a reviewing court is not to substitute its judgment for that of the agency. *Ibid.*

That deference is not without its limit, however, because a regulation "must be within the fair contemplation of the delegation of the enabling statute." *Ibid.* (citing *New Jersey Guild of Hearing Aid Dispensers*, 75 *N.J.* at 561–62, 384 *A.*2d 795)(quoting *Southern Jersey Airways, Inc. v. National Bank of Secaucus*, 108 *N.J.Super.* 369, 383, 261 *A.*2d 399 (App.Div.1970)). The Supreme Court has recognized that "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *Id.* at 223, 729 *A.*2d 21 (citing *New Jersey Guild of Hearing Aid Dispensers*, 75 *N.J.* at 562, 384 *A.*2d 795). Also, "[T]he absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *Ibid.* (quoting *A.A. Mastrangelo, Inc. v. Commissioner, Dep't of Envtl. Protection*, 90 *N.J.* 666, 683–84, 449 *A.*2d 516 (1982)). Indeed, one might argue that a regulation which has survived an attack under the "legislative veto" mechanism of our State Constitution's, *N.J. Const.* art. V, § 4, ¶ 6, should receive paramount deference.

In *County of Monmouth v. Department of Corrections*, 236 *N.J.Super.* 523, 524, 566 *A.*2d 543 (App.Div.1989), the County of Monmouth appealed the action of the Department of Corrections (DOC) in maintaining juveniles in county detention centers sen-

tenced to State institutions and refusing the County's demand for immediate transfer of the State-sentenced juveniles to State facilities. In holding the DOC failed to carry out its statutory obligation to promptly place State-sentenced juveniles in State facilities, we found that no statutory or regulatory authority existed for the DOC to "house" youths sentenced to State facilities in county detention centers. *Id.* at 526, 566 *A.*2d 543. We also pointed out that State-sentenced juveniles present a greater security risk to the county facility, its residents and staff than those whom the court determines may be housed in a county facility for a period not exceeding sixty days pursuant to *N.J.S.A.* 2A:4A–43c (The Juvenile Detention Commitment Program). *Id.* at 527, 566 *A.*2d 543. We there also stated, "Statutory and regulatory prohibitions against overcrowding have been continuously violated. The State has effectively shifted its burden to the counties *without legislative or executive authority.*" *Id.* at 528, 566 *A.*2d 543 (Emphasis added).

As we earlier observed at 9, in *County of Hudson v. Department of Corrections,* the Supreme Court affirmed the decision of this court upholding the validity and enforceability of *N.J.A.C.* 10:19–4.2(d) and (e) which provided for the transfer of State-sentenced juveniles from county to state facilities within three days. In reaching its decision the Supreme Court stated:

> It is clear that the Legislature intended, both before and after the creation of the JJC, to place the responsibility for housing state-sentenced juvenile offenders on the State. However, the Legislature did not provide for or mandate a time frame for removal of such delinquents from county facilities. The Legislature's silence in that regard cannot be ascribed to oversight or inadvertence. Clearly, it knew how to provide for removal because it enacted such a provision for state-sentenced adult offenders. *N.J.S.A.* 2C:43–10.

> \* \* \*

> The omission of a comparable time-specific transfer provision in the statute, when considered with the broad authority granted to the JJC, underscores the legislative decision to leave all aspects of the housing of juveniles to the discretion of the governing agency. Thus, the JJC's delegated power to deal with the removal and transfer of juvenile prisoners encompasses the authority to allow the existing three-day transfer regulation to continue as a valid regulation.

> [*County of Hudson,* 152 *N.J.* at 68–69, 703 *A.*2d 268.]

But the Court also pointed out the authority of an agency to amend, change, or repeal its regulations, especially in response to changing conditions. *Id.* at 72, 703 *A.*2d 268. The Court further stated that an agency has the power, and sometimes the obligation, to amend existing policies and regulations. *Ibid.*

*N.J.S.A.* 52:17B–170, the enabling statute for the JJC, provides, in pertinent part:

e.   The commission shall have the following powers, duties and responsibilities:

\* \* \*

(14) To formulate and adopt standards and rules for the efficient conduct of the work of the commission, the facilities, services, sanctions and programs within its jurisdiction and its officers and employees;

\* \* \*

(22) To promulgate, pursuant to the "Administrative Procedure Act," [52:14B–1 to –15], rules and regulations necessary to implement and effectuate the purposes of this act.

The statute has delegated to the JJC an extensive array of powers. *N.J.S.A.* 52:17B–170e(6) also empowers the JJC "[t]o establish minimum standards for the care, treatment government and discipline of juveniles confined pending, or as a result of an adjudication of delinquency"; (7) "[t]o assume the custody and care of all juveniles committed by court order, law, classification, regulation or contract to the custody of the commission ...";  (8) "[t]o manage and operate all State secure juvenile facilities ...";  (9) "[t]o manage and operate all State juvenile facilities or juvenile programs ...";  (10) "[t]o prepare an annual State Juvenile Justice Master Plan which identifies facilities, sanctions and services available for juveniles adjudicated or charged as delinquent and juvenile delinquency prevention programs and which identifies additional needs based upon the extent and nature of juvenile delinquency and the adequacy and effectiveness of available facilities, services, sanctions and programs"; and (11) "[t]o approve

plans for each county submitted by the county youth services commission pursuant to P.L.1995, c. 282 (C. 52:17B–180)."

The Administrative Procedure Act (APA), *N.J.S.A* 52:14B–1 to –15, provides for the manner in which an agency can amend an existing regulation. Specifically, *N.J.S.A.* 52:14B–4 states, in pertinent part, the following:

(a) Prior to the adoption, amendment, or repeal of any rule, except as may be otherwise provided, the agency shall:

(1) Give at least 30 days' notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the time when, the place where, and the manner in which interested persons may present their views thereon.

\* \* \*

(4) Prepare for public distribution a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions.

\* \* \*

(c) If an agency finds that an imminent peril to the public health, safety, or welfare requires adoption of a rule upon fewer than 30 days' notice and states in writing its reasons for that finding, and the Governor concurs in writing that an imminent peril exists, it may proceed without prior notice or hearing, or upon any abbreviated notice and hearing that it finds practicable, to adopt the rule.

█ In the present case, the recodification and amendment of *N.J.A.C.* 10:19–4.2(d) and (e) (providing for a three-day transfer period) as *N.J.A.C.* 13:90–4.2 (providing for the forty-five-day transfer period) and a new rule itself, *N.J.A.C.* 13:90–4.2, were adopted on an emergency basis pursuant to *N.J.S.A.* 52:14B–4c and statements of imminent peril were produced by Governor Whitman as well as then Attorney General Verniero, as Chair of the JJC. 30 *N.J.R.* 871 (March 2, 1998). On April 2, 1998 *N.J.A.C.* 13:90–4.2 was adopted by the JJC and the comments of numerous county representatives were heard as well as the JJC's responses. 30 *N.J.R.* 1619–1623 (May 4, 1998). Thus, the regulations were properly adopted by the JJC.

■ *N.J.A.C.* 13:90–4.2 appears to us as within the scope of the above-quoted broadly-worded enabling legislation of *N.J.S.A.* 52:17B–170e. Further, unlike the situation in *County of Monmouth v. Department of Corrections*, there now is an applicable regulation which provides for the specific forty-five-day transfer period, *N.J.A.C.* 13:90–4.2. The Supreme Court's finding of validity of the original time-specific three-day transfer period set forth in *N.J.A.C.* 10:19–4.2(d) and (e) in *County of Hudson v. Department of Corrections* augurs for a finding that *N.J.A.C.* 13:90–4.2 is a valid time-specific regulation despite the extensive time enlargement, if the State-level need is demonstrated and the time period is reasonable in the circumstances. The Supreme Court essentially instructed the JJC on the manner in which it could amend, change or alter its regulations to allow for a longer "transfer" period. *County of Hudson v. Department of Corrections*, 152 *N.J.* at 72–73, 703 *A.2d* 268. We conclude that *N.J.A.C.* 13:90–4.2 providing for a forty-five-day "transfer" period is not explicitly or manifestly inconsistent with the JJC's broad powers to cope with "juvenile justice services and sanctions at the State, county and local level." *N.J.S.A.* 52:17B–169k. The fundamental wisdom of such an extensive "transfer" or "holding" period is a matter of governmental policy and commitment of State resources, not for our judicial decision.

■ The Counties next argue that the *N.J.A.C.* 13:90–4.2 exceeds any statutory authority of the JJC. The Counties also urge that *N.J.S.A.* 2A:4A–37 and 2A:4A–44.1 serve as a strict legislative prohibition against shifting the burden of housing State-sentenced juveniles in the county facilities up to a possible forty-five-day time period. The State disagrees and also contends there is no statutory authority "requiring" the JJC to compensate counties in any particular way; the reimbursement is left to the complete discretion of the Commission.

As noted, *N.J.S.A.* 52:17B–170e(22) states the JJC may "promulgate, pursuant to the 'Administrative Procedure Act,' [52:14B–

1 to –15], rules and regulations necessary to implement and effectuate the purposes of this act."

*N.J.S.A.* 2A:4A–37 provides in pertinent part, the following:

a. The Juvenile Justice Commission ... shall specify the place where a juvenile may be detained; and the Department of Human Services shall specify where a juvenile may be placed in shelter.

\* \* \*

c. No juvenile shall be placed in a detention facility which has reached its maximum population capacity, as designated by the Juvenile Justice Commission.

f. (1) Where either the Juvenile Justice Commission or the Department of Human Services determines that a juvenile detention facility or shelter under its control or authority is regularly over the maximum population capacity ... the commission or department may restrict new admissions to the facility or shelter.

*N.J.S.A.* 2A:4A–44.1 provides, in pertinent part, the following:

The Juvenile Justice Commission . . *may* enter into an agreement with any county concerning the use of that county's juvenile detention facility for the housing of juveniles the court has placed under the custody of the commission for placement in State correctional facilities *only if the county's juvenile detention facility is not over its maximum rated capacity.*

[Emphasis added].

First, regarding the placement of juveniles in detention facilities already at maximum capacity, the State claims it is not attempting to originally "house" State-sentenced juveniles in county facilities but rather is imposing an allegedly temporary transfer period in order to accommodate severe overcrowding in State facilities. Under the broad enabling language of *N.J.S.A.* 52:17B–170e(22), we find the JJC has the requisite authority to impose on the counties and adopt the challenged regulation, *N.J.A.C.* 13:90–4.2, in this circumstance.

Second, regarding an agreement between the State and the County for the housing or temporary assignment of State-sentenced juveniles in county detention facilities, *N.J.S.A.* 2A:4A–44.1 provides that the State "may" enter into an agreement but does not require it to do so. In light of *N.J.A.C.* 13:90–4.2's express language that the forty-five-day time period is a transfer period, the regulation nominally does not directly conflict with existing

statutory authority and again we deem it valid within the broad enabling legislation of the JJC, *N.J.S.A.* 52:17B–170e. Because the attempt at a "legislative veto" of the regulation has failed, this reality tends to reinforce our conviction that *N.J.A.C.* 13:90–4.2 is a valid, though far from optimal, exercise of delegated legislative power.

### IV

Finally, we decline to entertain the Counties' claim that *N.J.A.C.* 23:90–4.2 violates the due process liberty interests on parole rights to "good-time" credits for juvenile offenders. We deem the record inadequate on this issue. Also, the parole authorities are not parties to this proceeding. Meanwhile, we have been assured in writing by the Attorney General that sentenced juvenile offenders will continue to be afforded "good-time" credit for any period of delay in transfer, while they remain in county detention. By Deputy Attorney General James D. Harris's letter of June 25, 1999 to the Presiding Judge of this Panel, the Attorney General on behalf of the State has represented and agreed as follows:

> Finally, this certification provides that since the issue was brought to the Juvenile Panel's attention through this appeal, the Juvenile Panel has agreed from this day forth to provide credit reduction pursuant to *N.J.A.C.* 10A:71–3.24 to state-sentenced juvenile offenders for the time spent in custody in county juvenile detention centers awaiting transfer to a state juvenile facility pursuant to *N.J.A.C.* 13:90–4.2.

> \* \* \*

> As noted in the attached certification, the New Jersey State Parole Board, from this day forward, shall implement a uniform policy for providing such credit reduction to state-sentenced juveniles for the time spent in custody in county juvenile facility awaiting transfer.

We accept and rely on this representation.

### V

Our decision today unfortunately does not advance a solution to the overcrowding of juvenile detention and sentence

facilities at both the county and State levels. This is a political and fiscal struggle between the State and its political subdivisions, not a problem for judicial resolution. *See County of Camden v. Waldman*, 292 *N.J.Super.* 268, 290–92, 678 *A.2d* 1101 (App.Div. 1996), *certif. denied*, 149 *N.J.* 139, 693 A.2d 109 (1997); *see also In re Grant of Charter School Application of Englewood on Palisades Charter School*, 320 *N.J.Super.* 174, 227, 727 *A.2d* 15 (App.Div.1999), *certif. granted*, 162 *N.J.* 481, 744 A.2d 1205 (1999). Obviously, the sooner a sentenced juvenile is removed to the State reformatory system upon adjudication and disposition, the better. The juvenile should promptly be placed in the State system and in programs optimally geared to education and rehabilitation, not left lingering in overcrowded county detention centers. Nothing is gained by such delay, and much potential for harm exits. We hope the Executive and Legislative branches will persist in an effort to find a solution to this vexing problem soon.

Affirmed.

## APPENDIX A

DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
RICHARD J. HUGHES JUSTICE COMPLEX
25 MARKET STREET
PO BOX 112
TRENTON, NJ 086254
E–Mail: schwatod@law.dol.lps.state.nj.us

(609)292–8582

CHRISTINE TODD WHITMAN
Governor

JOHN I. FARMER, JR.
Attorney General

JEFFREY J. MILLER
Assistant Attorney General
Director

332

January 20, 2000

VIA OVERNIGHT MAIL

Honorable Michael Patrick King, J.A.D.

Superior Court of New Jersey

Appellate Division

216   Haddon Avenue

Westmont, NJ 08108–2815

Honorable Richard Newman, J.A.D.

Superior Court of New Jersey

Appellate Division

155 Morris Avenue, Third Floor

Springfield, NJ 07081–1216

Honorable John E. Wallace, Jr., J.A.D.

Superior Court of New Jersey

Appellate Division

216 Haddon Avenue

Westmont, NJ 08108–2815

> RE: *Hudson County v. State. et al*
> Docket No. A–4419–97T2
> *Camden County v. State, et al*
> Docket No. A–4638–97T2

Dear Honorable Judges of the Appellate Division:

Please accept this letter as a further response to the court's inquiry set forth in correspondence dated October 22, 1999 requesting the "current status of this matter especially any actions taken by the Executive Branch or the Governor with respect to the pertinent transfer-time regulation." Please be advised that at its meeting on January 19, 2000, the Executive Board of the Juvenile Justice Commission authorized a proposal to amend the existing 45–day transfer regulation set forth at N.J.A.C. 13:90–4.2.

The proposal is to reduce the maximum number of days within which transfer must be made from 45 days to 30 days and to recodify the rule to N.J.A.C. 13:92–4.2 There are no other proposed changes to N.J.A.C. 13:90–4.2. It is anticipated that the proposal will be published in the New Jersey Register on February 22, 2000. A copy of the Notice of Proposal is attached for your review.

Please advise if you require additional information.

Respectfully yours,

JOHN J. FARMER, JR.
ATTORNEY GENERAL OF NEW JERSEY

BY:_____

John Franzini

Deputy Attorney General

JF/sb

Enclosure

cc:  Michael A. Cifelli, Esq.
     Donna M. Whiteside, Esq.
     AAG Nancy Kaplen
     Bruce D. Stout, Executive Director, Juvenile Justice Commission

## LAW AND PUBLIC SAFETY

## JUVENILE JUSTICE COMMISSION

Juvenile Population in Detention

Proposed Amendment: N.J.A.C. 10:19–4.2

Proposed Repeal: N.J.A.C. 13:90–4

Authorized By: Executive Board of the Juvenile Justice Commission, by the Honorable John J. Farmer, Jr., Attorney General and Chair.

Authority: N.J.S.A. 52:17B–169, 52:17B–170(a), 52:17B–170(e), 52:17B–170(e)(22), 52:17B–176(a)(3) and 52:17B–177.

Proposal Number: PRN 2000–

Submit written comments by to:

Bruce D. Stout
Executive Director
New Jersey Juvenile Justice Commission

334

P.O. Box 107
Trenton, New Jersey 08625–0107

The agency proposal follows.

## Summary

In accordance with Executive Order No.66 (1978), the rules at N.J.A.C. 13:90–4, concerning Juvenile Population in Detention, are scheduled to expire on May 12, 2000.

These rules were originally adopted by the Juvenile Justice Commission, hereinafter referred to as the "Commission" as an emergency basis and became effective February 3, 1998. The rules were then readopted in compliance with the rulemaking requirements of the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq., effective April 3, 1998.

Background on the origins of N.J.A.C. 13:90–4 follows.

In December 1997, the Commission faced a major crisis in the administration of the State's Juvenile Justice System when the Supreme Court of New Jersey, ruled in *County of Hudson v. Department of Corrections, et al,* and County of Camden V Peter Verniero, et al., that the Commission was required to comply with the Department of Human Services' rule at N.J.A.C. 10:19–4.2, a regulation originally adopted by the Department of Corrections which provided the State with only three days to remove State-sentenced juveniles from county detention centers following receipt of an order of commitment and a predisposition or presentence report.

Because of severe crowding in State juvenile facilities, the Commission found the three-day regulation to be unrealistic and unworkable. From its creation in December 1995, the Commission had been transferring State-sentenced juveniles from county facilities as expeditiously as possible, but that sometimes meant 60 days or more given the chronic crowding conditions that existed in State and county facilities.

The Supreme Court ordered immediate compliance with the three-day rule as it related to State-sentenced juveniles in the detention centers in Camden and Hudson Counties, but postponed the effective date of its decision with respect to all other counties for a period of 60 days to permit the Commission to, "take legally effective action to relieve itself of the burden in complying with the three-day transfer requirement." Importantly, the Supreme Court noted that the State was then in the process of amending the transfer rule and stated that, "in accordance with its provisions, transfers of juvenile delinquents from county facilities under the proposed rule will not be required within three days but will be effectuated over longer periods." With this acknowledgment, the Court affirmed the Commission's position that the Legislature, with the enactment of its 1995 reform of the State's juvenile justice system, had delegated to it the authority to determine, "all aspects of the housing of juveniles," including the authority to remedy overcrowding in State and county juvenile facilities, by, among other things, fixing a longer time period for transferring State-sentenced juveniles from county detention facilities.

Consistent with the Supreme Court's decision, the Commission adopted the transfer rule, N.J.A.C. 13:90–4.2, first on an emergent basis and thereafter through the standard rulemaking process. The new rule redefined the time frame for the removal of State-sentenced juveniles from three days to a maximum of 45 days and further provided, subject to available appropriations, a per diem rate to counties for State-sentenced juveniles in county juvenile detention centers as of the sixteenth day after receipt of a commitment order and predisposition report by the Commission.

The Juvenile Justice Commission was created pursuant to Governor Whitman's Juvenile Justice Reform Legislation, P.L.1995, Chapter 284 (N.J.S.A. 52:17B–169 et seq.), which resulted from recommendations of the Governor's Advisory Council on Juvenile Justice. The Commission was established as the single agency of State government responsible for planning, policy development, operations, contracting and advocacy for youth involved, or at risk

of involvement, in the juvenile justice system. The Commission became responsible for the custody and care of any juvenile adjudicated delinquent and committed or classified to the custody and care of the Department of Corrections or the Division of Juvenile Services within the Department of Human Services, and any juvenile serving a term of incarceration in a county juvenile detention facility (N.J.S.A. 52:17B–176(a)(3)).

The Governor's Advisory Council recognized that the juvenile justice system was experiencing significant problems with crowding in State and county juvenile facilities. Since its creation in 1995, the Commission has continued to be confronted with the problem and has responded to it with the development and implementation of a multi-faceted strategy. The Commission has increased bed space with the creation of a Stabilization and Reintegration Program, (bootcamp). This bootcamp maintains an orientation unit of 28 beds and platoons of 60 cadets at Wharton Tract. The Commission has also added 35 secure beds for females with the opening of the Valentine Unit in Bordentown. The Commission continues to operate 21 community programs. These programs have expanded their population capacities thereby placing a burden on their efficient operation.

The Commission continues to maintain mobile classification teams to expedite the process of removing juveniles from the county detention centers through the early collection of background and offense information and the initial screening of the juveniles' levels of risk and needs.

The Commission continues to operate the State/Community Partnership Grant Program which has provided over $10 million annually for the last three and a half years. In FY2000 the Commission will provide $11.1 million in Partnership and Family Court funding to the States' 21 counties. The Partnership program has funded the development of county-based programs aimed at reducing crowding in county detention facilities and has increased program options to the Courts to divert juveniles from

the Commission's facilities. In 1999 a total of 224 programs were funded throughout the State. Of these, 34 were programs to reduce detention overcrowding. These 34 programs served 1,091 juveniles in 1999. Sixty-eight of the Partnership funded programs provided increased dispositional options to the Family Court. These programs served 1,252 juveniles in 1999.

The transfer rule at N.J.A.C. 13:90–4.2 adopted by the Commission represents another element in the multi-faceted State response to the chronic crowding conditions in State and county juvenile facilities. Additionally, the Commission's Aftercare/Parole Services unit has expedited the return of parole violators to the Commission's institutions thereby not contributing to detention overcrowding.

Even with these initiatives, the Commission has continued to wrestle with crowded conditions in its facilities. In calendar year 1999, the Commission's overall institutional/residential population was 1,226. The actual bed capacity was 1,139. Therefore, on average, the Commission operated at 108% of capacity, a shortage of 87 beds.

The current 45–day transfer rule was adopted by the Commission as one that could be achieved based upon a review of intake records. In considering an appropriate transfer period, the Commission was aware that on occasions in the past, State-committed juveniles had remained in county detention centers for longer periods of time. The Commission concluded that the 45–day time frame was workable, given the results being produced by some of the initiatives described above.

The 45–day transfer rule has eased the crowding situation at the New Jersey Training School for Boys in Monroe Township by providing an orderly rhythm to the process of bringing juveniles into the centralized intake and classification units. State-sentenced juveniles arc received by the Commission at the Training School where they are classified and then assigned to one of three secure care institutions or one of 21 community programs. The

classification process at the Training School extends for two weeks, during which time the juveniles are subject to several interviews and evaluations, including medical, educational and psychological evaluations. Assignments to secure care facilities or community programs are not made until the medical and psychological evaluations are complete. A substantial increase in the number of juveniles entering the Training School because of an unreasonably abbreviated transfer requirement would increase the length of the classification process, and thus disrupt the orderly assignment of juveniles. The resources available to the Commission for medical and psychological evaluations are calculated to respond to 20 to 25 admissions per week. A substantial increase in admissions, with a return to the three day rule for every juvenile henceforth committed to the Commission, would put a strain on the classification process to the point of dysfunction.

The 45-day transfer rule has permitted the Commission a necessary level of flexibility in responding to current conditions and any increase in commitment patterns by the courts, but also recognizes the needs of the counties. If a State-sentenced juvenile remains at a county facility longer than 15 days during the current 45 day period, the Commission provides a per diem rate currently fixed at $58.50 to the county, beginning on the sixteenth day from receipt by the Commission of the commitment order and predisposition report for each State-sentenced juvenile.

Since the adoption of the 45-day transfer rule in February 1998, the Commission has intensified its efforts to remove juveniles from county detention facilities as expeditiously as possible so as to minimize the burden on the county facilities. The average daily number of committed juveniles awaiting placement from January 1997 to June 1997 was 151. From July 1997 to December 1997, the number was reduced to 65. From July 1998 to June 1999 the average daily number of committed juveniles awaiting placement with the Commission was 43.

N.J.S.A. 2A:4A–44d.(5) requires that every disposition that includes a term of incarceration shall include a term of post-incarceration supervision equivalent to one-third of the term of incarceration imposed. During this period of post-incarceration supervision the juvenile parolee remains in the legal custody of the Commission. Since this law was enacted, the number of parole violators returning to the Commission's institutions has risen from 150 in 1997 to well over 200 in 1998 and 1999. These juveniles have further contributed to Commission overcrowding. Furthermore, this number is expected to increase as juveniles committed since the enactment of this law are beginning to be paroled.

The Commission continues to work closely with all detention centers, honoring all requests for emergency placement. During 1999 the Reception Unit at the Training School in Monroe Township was shut down to complete necessary repairs and renovations to the building. Had this not been necessary, the average waiting period for transfer from county detention would have been further reduced.

Through herculean efforts, the Commission has been able to reduce the time that State-committed juveniles remain in county facilities. In 1998, on average, committed juveniles entered the Commission's Reception Unit at the Training School for Boys in Monroe Township in 11 days after receipt by the Commission of the commitment order and predisposition report for each State-sentenced juvenile. In 1999, this average waiting period was reduced to nine days, thereby placing a lesser burden on the counties for housing these juveniles. The Commission has also undertaken two major capital projects that will increase Commission bed space. These expansion projects, a new 144 bed secure unit and a new 80 bed unit, should enable the Commission to further improve its laudable record in expeditiously removing State-committed juveniles from county detention facilities.

The 45–day transfer rule, as implemented by the Commission, has proven both workable for the Commission and responsive to

the needs of the counties. A return to the requirement of a three-day transfer could not be accomplished without disruption to the smooth operation of the removal process, nor without additional resources to the Commission.

The 45–day rule at N.J.A.C. 13:90–4.2 has been a practical and workable response to chronic crowding conditions within the juvenile justice system, and is a fiscally prudent measure for the Commission and the counties.

Nevertheless, despite the fact that the Commission still believes that the 45 day rule is prudent, in an effort to address county concerns regarding overcrowding and in light of the Commission's continuing efforts to transfer State-committed juveniles out of county detention centers as quickly as possible, the Commission is proposing to amend the 45 day rule to by reducing the maximum amount of time juveniles can await transfer to the Commission. The Commission is proposing to reduce the maximum 45 day time frame to a maximum of 30 days and to retain the per diem payment provision. Based upon the Commission's experience since its creation and the results of its multi-faceted response to the chronic problem of overcrowding, the Commission projects that it can safely meet this reduced maximum time frame for transfer.

In light of the expiration date of this rule, the Commission has reviewed N.J.A.C. 13:90–4.2 and has determined to repeal it at its current codification and amend it by recodifying it to N.J.A.C. 10:19, proposed elsewhere in this issue of the New Jersey Register as a readoption and recodification with amendments from N.J.A.C. 10:19 to N.J.A.C. 13:92.

*Social Impact*

The proposed amendment will have a positive social impact in that it may establish another element in a multi-dimensional response by the Commission to the complex problem of over-crowding in State and county juvenile corrections facilities. The

rule defines a reasonable time frame that balances the interests of the State and the counties in dealing with removal of State-sentenced juveniles from county juvenile detention facilities to State institutions. As such, the rule supports the juvenile justice reform initiative to reduce overcrowding throughout the juvenile justice system.

## Economic Impact

The proposed amendment will provide for financial assistance to counties and thus represents a positive economic impact. The existing rule recognizes the need to reimburse counties for payment beginning on the sixteenth day that a committed juvenile remains in a county detention facility after notification to the Commission of commitment. Therefore this proposed amendment maintains this commitment.

## Federal Standards Statement

The proposed amendment does not pertain to any program established under Federal law or under a State statute that incorporates or refers to Federal law, standards or requirements. An explanation or analysis of the proposed amendment pursuant to Executive Order No.27 (1994), therefore, is not required.

## Jobs Impact

The Juvenile Justice Commission does not anticipate that the proposed amendment will result in the generation or loss of jobs.

## Agriculture Industry Impact

The proposed amendment will have no impact on the agriculture industry in New Jersey.

## Regulatory Flexibility Statement

The proposed amendment will impose no reporting, record keeping or other compliance requirements upon small businesses as defined under the Regulatory Flexibility Act, N.J.S.A. 52:14B–

16 et seq. The rule relates to the time frame in which State-sentenced juveniles are removed from county detention facilities to the intake unit of the Training School. A regulatory flexibility analysis, therefore, is not required.

*Full text* of the proposed repeal may be found the in the New Jersey Administrative Code at N.J.A.C. 13:90–4.

*Full text* of the proposed amendment follows (additions indicated in boldface thus deletions indicated in brackets [thus] ): 10:19–4.2 Juvenile population capacity

(a)–(c) (No change in text.)

*(d) Consistent with the purpose set forth by the Legislature in the juvenile justice reform legislation to reduce overcrowding at all State and county juvenile facilities, a juvenile who receives a State sentence of incarceration shall be transported to the juvenile intake unit at the New Jersey Training School for Boys no later than 30 days after the Juvenile Justice Commission receives notification. in the form of a signed commitment order and a presentence or predisposition report. from the county where the juvenile has been sentenced. Subject to the availability of appropriation. the Commission also shall provide a Commission-determined per diem rate to the counties for State-committed juveniles held in the county detention centers from the 16th day after receipt by the Commission of the signed commitment order and presentence or predisposition report for each State-sentenced juvenile. The per diem rate shall be established by the Commission from time to time. The 30 days shall be exclusive of the date on which the Commission receives the appropriate and necessary documentation.*

*(e) The county official who is responsible for transporting the juvenile shall contact the Juvenile Justice Commission to ascertain the date on which such transfer may be effected.*

John J. Farmer, Jr., First Asst. A.G.
Attorney General
Chair, Juvenile Justice Commission
Executive Board

<u>1/19/00</u>
Date