703 A.2d 268

THE COUNTY OF HUDSON, PLAINTIFF–RESPONDENT, v. DEPARTMENT OF CORRECTIONS, STATE OF NEW JERSEY, WILLIAM H. FAUVER, COMMISSIONER DEPARTMENT OF LAW AND PUBLIC SAFETY, JUVENILE JUSTICE COMMISSION, STATE OF NEW JERSEY DEBORAH T. PORITZ, ATTORNEY GENERAL, DEFENDANTS–APPELLANTS.

THE COUNTY OF CAMDEN, A BODY POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. PETER G. VERNIERO, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE JUVENILE JUSTICE COMMISSION OF THE STATE OF NEW JERSEY, AND CHAIR OF THE EXECUTIVE BOARD OF

THE JUVENILE JUSTICE COMMISSION; PAUL DONNELLY, EXECUTIVE DIRECTOR OF THE JUVENILE JUSTICE COMMISSION OF THE STATE OF NEW JERSEY, IN HIS OFFICIAL CAPACITY; THE JUVENILE JUSTICE COMMISSION; AND THE STATE OF NEW JERSEY; WILLIAM FAUVER COMMISSIONER OF DEPARTMENT OF LAW AND PUBLIC SAFETY AND DEPARTMENT OF CORRECTIONS, DEFENDANTS–APPELLANTS.

Argued October 6, 1997—Decided December 10, 1997.

62

*Daisy B. Barreto*, Deputy Attorney General, argued the cause for appellants (*Peter Verniero*, Attorney General of New Jersey, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Barreto* and *Donald M. Palombi*, Deputy Attorneys General, on the briefs).

*Robert G. Millenky*, County Counsel, argued the cause for respondent The County of Camden (*Mr. Millenky*, attorney; *Mr. Millenky* and *Donna M. Whiteside*, Assistant County Counsel, on the brief).

*Michael A. Cifelli*, Assistant County Counsel, argued the cause for respondent The County of Hudson (*Francis DeLeonardis*, Hudson County Counsel, attorney).

*Andrew M. Baron*, Assistant County Counsel, submitted a letter in lieu of brief on behalf amicus curiae, The County of Union (*Jeremiah D. O'Dwyer*, Acting Union County Counsel, attorney).

PER CURIAM.

The issue in this case is whether the State must comply with a duly-enacted administrative regulation that requires the transfer of state-sentenced juveniles from county to state facilities within three days. Two counties challenged the State's refusal to transfer their juvenile delinquents within the three-day time period required by the regulation.

The circumstances giving rise to this litigation are that the juvenile detention centers in both Camden and Hudson Counties are overcrowded. Overcrowding has resulted in the intermingling of state-sentenced and non-sentenced youth in the detention centers. In response to that problem, both counties demanded that the State comply with the three-day regulation and transfer the state-sentenced juveniles to State facilities within that time. The State refused to comply with the regulation because its own two juvenile facilities were overcrowded. Instead, the State adopted a policy of transferring the juveniles "as expeditiously as possible, as circumstances permit, but not always in compliance with the three day requirement."

Both counties filed notices of appeal with the Appellate Division. The Appellate Division ruled that the regulation was valid and enforceable and ordered the State to transfer the juveniles within the three-day time period as required by the regulation. 300 *N.J.Super.* 389, 693 *A.*2d 146 (1997). The State petitioned for certification and filed an emergent application for a stay of the court's judgment. The Court granted the petition for certification and granted the motion for a stay except as to the two counties involved. 149 *N.J.* 406, 694 *A.*2d 192 (1997).

We affirm the judgment upholding the validity and enforceability of the transfer regulation. Except as to Hudson and Camden Counties, that judgment is stayed for a period of sixty days from the date of this decision to enable the State to take necessary measures to comply with the time period of the transfer regulation, unless that regulation is sooner modified and superseded by a valid amendatory regulation or other legally effective State action.

I

Foreshadowing the current litigation, in 1989 the Appellate Division held unlawful the State's practice of maintaining state-sentenced juveniles in county detention centers after final disposition. *County of Monmouth v. Department of Corrections,* 236 *N.J.Super.* 523, 566 *A.*2d 543 (App.Div.1989). The court determined that under the then-applicable statute, *N.J.S.A.* 2A:4A–43, – 44 (since amended), the burden of housing state-sentenced juveniles was on the State rather than the counties. Accordingly, the court ordered the Department of Corrections (DOC) to effectuate its statutory duty to house state-sentenced juveniles by promulgating regulations to provide for the removal of those juveniles from the county detention centers. *County of Monmouth, supra,* 236 *N.J.Super.* at 528, 566 *A.*2d 543. Pursuant to that order, in 1991, the DOC issued the three-day removal regulation, *N.J.A.C.* 10:19–4.2(d). The regulation provides as follows:

A juvenile who receives a State sentence of incarceration shall be transported to the juvenile intake unit at the New Jersey Training School for Boys no later than

three working days after the Department of Corrections receives notification, in the form of a signed commitment order and a presentence or predisposition report, from the county where the juvenile has been sentenced. The three working days shall be exclusive of the date on which the Department of Corrections receives the appropriate and necessary documentation.

*[Ibid.]*

That regulation forms the basis for the holding of the Appellate Division in this case that the State is required to transfer within three days state-sentenced juveniles from county facilities to State juvenile detention facilities. The Appellate Division determined that legislation that substantially revised the juvenile justice system, *N.J.S.A.* 52:17B–169 to –178, and created a new agency with complete authority over the housing of juveniles in the juvenile justice system did not, as argued by the State, repeal the three-day transfer regulation, and that regulation remained valid and fully enforceable. 300 *N.J.Super.* at 392–94, 693 *A.*2d 146. We affirm the judgment substantially for the reasons of the Appellate Division as expressed by Judge Shebell.

In 1995, the Legislature enacted *N.J.S.A.* 52:17B–169 to –178. That statute established the Juvenile Justice Commission (JJC) to oversee all juvenile justice matters. *N.J.S.A.* 52:17B–170a. The State argues that the 1995 legislation creating the JJC completely revamped the entire juvenile justice system and effectively displaced the three-day transfer regulation, *N.J.A.C.* 10:19–4.2(d), which, as noted, the DOC had promulgated in 1991.

Prior to the establishment of the JJC, three State agencies were responsible for the juvenile justice system: the DOC, the Department of Law and Public Safety, and the Department of Human Services. *N.J.S.A.* 52:17B–169d. With the creation of the JJC under *N.J.S.A.* 52:17B–170a, the State established a single agency "responsible for developing a Statewide plan for effective provision of juvenile justice services and sanctions at the State, county and local level...." *N.J.S.A.* 52:17B–169k. The Governor hailed the new legislation as "overhauling the entire system" and bringing about an "efficient, unified juvenile justice system...." *Remarks*

*of Governor Christine Todd Whitman–Juvenile Justice Bill Signing* (Dec. 15, 1995).

The Legislature, in effect, transferred and consolidated the authority over the juvenile justice system previously exercised by the three separate executive departments. Under *N.J.S.A.* 52:17B–176, the Legislature placed in the JJC all of the powers and responsibilities the other three agencies had in respect of juveniles. The Legislature empowered the JJC to establish standards for the "care, treatment, government and discipline of juveniles" adjudicated delinquent, *N.J.S.A.* 52:17B–170e(6), to assume the custody and care of juveniles committed to it by law, *N.J.S.A.* 52:17B–170e(7), to formulate and adopt standards and rules for the efficient running of the commission and its facilities, *N.J.S.A.* 52:17B–170e(14), and to promulgate rules and regulations necessary to effectuate the purposes of the commission, *N.J.S.A.* 52:17B–170e(22).

Within the JJC's enabling legislation, the Legislature specifically provided for the continuation of any regulations promulgated by the other agencies. *N.J.S.A.* 52:17B–177b(3) provides as follows:

All rules and regulations promulgated by the Commissioner of Corrections or the Commissioner of Human Services pertaining to functions, powers, duties and authority transferred to the commission pursuant to [52:17B–176] shall be considered rules or regulations of the commission and, as such, *shall remain in full force and effect* until expiration or modification by the commission in accordance with law.

[*Ibid.* (emphasis added).]

The State argues that the JJC enabling legislation was intended to cover the entire subject matter of juvenile justice, including the detention and housing of all juveniles coming into the juvenile justice system and charged with and sentenced for delinquency. Consequently, the State contends, this comprehensive legislative scheme supersedes any prior enactments concerning juvenile justice. The State acknowledges the statutory delegation to the JJC of the power to amend any previously-enacted regulations, along with the delegation of all prior statutory and regulatory power. Nevertheless, it argues that the existing rules, even if

unrepealed and unamended by the JJC, are ineffective and unenforceable.

There is, however, no indication that the Legislature intended to supersede and nullify any existing rules, including the transfer rule, in the absence of any regulatory action by the JJC serving to repeal or modify such rules. Rather, the opposite inference is irresistible. As noted, the statute expressly provides that, as related to the responsibility delegated to the JJC over the juvenile justice system, "[a]ll rules and regulations promulgated by the [agencies formerly with authority over the juvenile justice system] shall be considered rules or regulations of the [JJC] and, as such, shall remain in full force and effect until expiration or modification by the [JJC]." *N.J.S.A.* 52:17B–177b(3). The statute thus expressly mandates the continuation, not the termination, of existing rules and regulations.

It is clear that the Legislature intended, both before and after the creation of the JJC, to place the responsibility for housing state-sentenced juvenile offenders on the State. However, the Legislature did not provide for or mandate a time frame for removal of such delinquents from county facilities. The Legislature's silence in that regard cannot be ascribed to oversight or inadvertence. Clearly, it knew how to provide for removal because it enacted such a provision for state-sentenced adult offenders. *N.J.S.A.* 2C:43–10. The Legislature and Executive have dealt continuously with that serious situation. *See, e.g., L.* 1994, *c.*12 (declaring prison overcrowding an emergency and authorizing Governor to issue executive orders to address "the crowding problem"); *L.* 1996, *c.*9 (extending Governor's executive authority under 1994 law for two more years); *see also County of Morris v. Fauver*, 296 *N.J.Super.* 26, 685 *A.*2d 1342 (App.Div.) (construing contract between Department of Corrections and Counties providing housing for state inmates in county facilities with appropriate per diem compensation), *certif. granted,* 149 *N.J.* 409, 694 *A.*2d 194 (1997). Further, the Legislature has witnessed a continuing struggle between the counties and the State over the housing,

removal, and transfer of adult offenders. *E.g., compare Worthington v. Fauver*, 88 *N.J.* 183, 440 *A.*2d 1128 (1982) (holding that use of executive emergency power to deal with overcrowding of adult prison population was lawful) *with County of Gloucester v. State*, 132 *N.J.* 141, 623 *A.*2d 763 (1993) (holding that repeated use of executive emergency power for over twelve years was beyond the scope of enabling statute). It is thus not possible to believe that the Legislature was unaware of or indifferent to the overcrowding of juveniles in county detention facilities. As summarized by Judge Shebell, "the problems with overcrowding specifically caused by the detention of State-sentenced offenders in these County Youth Detention Centers are well-documented." 300 *N.J.Super.* at 393, 693 *A.*2d 146. Indeed, the Council report and Senate hearings on the juvenile justice legislation both expressed frustration with the State's prior handling of its duties and the State's failure to adhere to what they saw as a mandatory removal requirement of the three-day transfer regulation. Governor's Advisory Council on Juvenile Justice, *Final Report* (Dec. 30, 1994) (stating, with approval, that "juveniles who are committed to the authority of the Department of Corrections or the Division of Justice Services in the Department of Human Services must, as a matter of law, be removed from county detention within 72 hours of disposition"); Juvenile Justice System: *Hearings on S.B. 2211 Before the Senate Law and Public Safety Committee* (Sept. 11, 1995).

The omission of a comparable time-specific transfer provision in the statute, when considered with the broad authority granted to the JJC, underscores the legislative decision to leave all aspects of the housing of juveniles to the discretion of the governing agency. Thus, the JJC's delegated power to deal with the removal and transfer of juvenile prisoners encompasses the authority to allow the existing three-day transfer regulation to continue as a valid regulation. It has effectively continued the transfer regulation by not enacting new regulations repealing or amending that regulation.

Consistent with the JJC's statutory power to promulgate new regulations and amend existing regulations, it is clearly inferable that the Legislature did not intend by the passage of the comprehensive juvenile justice reform act to supersede and nullify the regulation for the transfer of state-sentenced juveniles in the absence of an exercise by the JJC of its statutory authority to change that regulation. *See N.J.S.A.* 52:17B–177b(3); *cf. Kemp v. State,* 147 *N.J.* 294, 307, 687 *A.*2d 715 (1997) (noting that if inconsistency between successive statutes is not fatal to the operation of either, no repeal will be effected).

Based on the statutory provision providing for the continuing effect of the prior rules and regulations in light of its legislative history, we conclude that *N.J.A.C.* 10:19–4.2(d) remains a valid regulation.

### III

The State argues that the JJC has the implied authority to disregard the regulation governing the time for the transfer of state-sentenced juvenile offenders.

Because administrative regulations that apply to the regulated public have the force and effect of statutory law, an administrative agency ordinarily must enforce and adhere to, and may not disregard, the regulations it has promulgated. *In re Waterfront Development Permit,* 244 *N.J.Super.* 426, 434, 582 *A.*2d 1018 (App.Div.1990) (quoting *Pacific Molasses Co. v. F.T.C.,* 356 *F.*2d 386, 389–90 (5th Cir.1966), for the proposition that when an agency "promulgates rules to govern its proceedings, these rules must be scrupulously observed.... [O]nce an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules."), *certif. denied,* 126 *N.J.* 320, 598 *A.*2d 880 (1991); *County of Monmouth, supra,* 236 *N.J.Super.* at 525, 566 *A.*2d 543 (stating in *dicta* that agency action in violation of its own regulations is arbitrary and capricious); 1 Charles H. Koch, Jr., *Administrative Law and Practice* § 3.73 (1985 & Supp.1997) (concluding that

agency generally must follow its own legislative rules); 2 Kenneth C. Davis, *Administrative Law Treatise* § 7:21 (2d ed. 1979 & Supp.1989) (concluding that legislative rules are "clearly" binding on issuing agency because valid legislative rules have effect of a statute).

Administrative agencies possess wide discretion and authority to select the means and procedures by which to meet their statutory objectives; an agency itself is best suited to review its own regulations and, in deciding whether or not to change them, to choose the means by which to proceed. *Texter v. Department of Human Servs.*, 88 *N.J.* 376, 383, 385–87, 443 *A.*2d 178 (1982). Nevertheless, although an administrative agency may change its regulations, so long as they are in force the agency is bound by them. *In re Waterfront Development Permit, supra,* 244 *N.J.Super.* at 434, 582 *A.*2d 1018; *Iuppo v. Burke,* 162 *N.J.Super.* 538, 548–50, 394 *A.*2d 96 (App.Div.) (stating that Commissioner of Education was "bound by duly promulgated rules and regulations" and that he improperly suspended them without formal amendment procedures), *certif. denied,* 79 *N.J.* 462, 401 *A.*2d 219 (1978).

The State has not attempted formally to waive the transfer regulations. Absent a statute or regulation authorizing the waiver of otherwise valid and enforceable administrative regulations, an agency generally should not waive its own duly-enacted regulations by disregarding them. *Dougherty v. Department of Human Servs.*, 91 *N.J.* 1, 8, 12, 449 *A.*2d 1235 (1982) (reversing attempted waiver of agency's reimbursement regulation on grounds that agency should first consider grounds for waiver of that regulation); *see also SMB Assocs. v. New Jersey Dep't of Envtl. Protection,* 264 *N.J.Super.* 38, 624 *A.*2d 14 (App.Div.1993) (holding that waiver of DEP regulations may not be granted to party in absence of duly promulgated regulation setting standards for such waivers), *aff'd on other grounds,* 137 *N.J.* 58, 644 *A.*2d 558 (1994).

We conclude that the State must adhere to the requirement of its existing regulation governing the transfer of state-

sentenced juveniles to State facilities within three working days of being notified of the sentence as provided therein.

■ That conclusion in no way forecloses or inhibits the State from taking appropriate action in respect of the housing of juveniles coming into the juvenile justice system. In general, an agency has the authority to amend, change, or repeal its regulations, especially in response to changing conditions. *See Dougherty, supra,* 91 *N.J.* at 10, 449 *A.*2d 1235 ("[T]he Legislature has delegated to the agencies the authority to adopt, revise and enforce implementing regulations...."). An agency has the power, and sometimes the obligation, to amend existing policies and regulations. *See Saint Joseph's Hospital & Medical Center v. Finley,* 153 *N.J.Super.* 214, 224–25, 379 *A.*2d 467 (App.Div.1977) (holding that so long as agency acts reasonably, "an administrative agency may pass regulations in the light of present and future requirements of the public interest in its field despite a prior determination to the contrary"), *certif. denied,* 75 *N.J.* 595, 384 *A.*2d 825 (1978). While *N.J.S.A.* 52:17B–177b(3) states that previous regulations of the DOC are now the rules of the JJC, it also provides that those rules may be modified or amended by the JJC.

■ Here the JJC has purported to adopt informally a policy that, in effect, disregards the provisions of its transfer regulation. Under the general rule requiring a regulation providing for waiver authority, that policy alone cannot constitute a valid waiver of the transfer regulation. Consequently, that policy cannot be a valid basis for the State's exercise of its statutory juvenile removal and transfer authority.

■ Moreover, its policy cannot be deemed a valid amendment of the transfer regulation. The Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15, provides the manner by which an agency can amend existing regulations. *See N.J.S.A.* 52:14B–4a. Thus, under the APA, the JJC can adopt an amendatory regulation through the same notice and comment procedures that it used to adopt the regulation in the first place. *Ibid.* The JJC has

already embarked on this course with its proposal to modify the transfer time period. *See* 29 *N.J.R.* 1667(a) (May 5, 1997) (proposing to delete *N.J.A.C.* 10:19–4.2(d), (e) and replace them with *N.J.A.C.* 13:90–4.1, –4.2 providing for a sixty-day transfer period for 1997, a forty-five-day transfer period for 1998, and a thirty-day transfer period for 1999 and later).

The APA also enables an agency to adopt an emergency regulation if it "finds that an imminent peril to the public health, safety, or welfare requires adoption of a rule" without strict notice and comment procedures. *N.J.S.A.* 52:14B–4c. Such an emergency rule, if appropriate, would have effect for only a limited period of time, *see ibid.*, but it would give the JJC more time to address the problem.

■ Further, if warranted by exigent circumstances, the JJC can seek relief through executive order. Under the Civil Defense and Disaster Control Act, *N.J.S.A.* App.A:9–30 to –63, the Governor can employ the resources of the counties to assist in an emergency facing the State as a whole. Such powers have been used in the past to handle overcrowding of adult prisoners, *see, e.g., Worthington v. Fauver, supra,* 88 *N.J.* 183, 440 *A.*2d 1128 (upholding use of executive emergency power to deal with overcrowding of adult prison population), and can be invoked if this situation rises to the level of an emergency and the proper procedures are followed.

■ Finally, as pointed out by the Appellate Division in this case, *N.J.S.A.* 2A:4A–44.1, which was enacted following the *Monmouth* decision of the Appellate Division, "permit[s] agreements between the State and Counties and provid[es] safeguards to prevent overcrowding." 300 *N.J.Super.* at 393, 693 *A.*2d 146. That opportunity to contract remains open to the State.

IV

■ We affirm the judgment of the Appellate Division. We are mindful of the State's evidence relating to overcrowding in

juvenile detention facilities and of the State's contention that it lacks resources to comply with the three-day transfer rule. As noted, the State is currently in the process of amending the transfer rule, and, in accordance with its provisions, transfers of juvenile delinquents from county facilities under the proposed rule will not be required within three days but will be effectuated over longer periods. We cannot, however, authorize the State to disregard the current transfer regulation, particularly when, as explained in this opinion, it has other avenues to take legally effective action to relieve itself of the burden in complying with the three-day transfer requirement. Nevertheless, this Court may, in the exercise of equitable discretion, take into account relevant circumstances in determining the effective date of its decision regarding the enforceability of the regulatory enactment. *See, e.g., Salorio v. Glaser,* 93 *N.J.* 447, 467, 461 *A.*2d 1100 (1983) (noting "our concern for the fiscal and administrative problems that would be engendered if the State were compelled [to comply immediately]" with judicial decision invalidating tax statute). A postponement of the effective date of our decision is appropriate here given the current overcrowding of State juvenile detention centers and the importance of adequately providing for the housing of juveniles. *Cf. County of Gloucester, supra,* 132 *N.J.* at 153, 623 *A.*2d 763 (giving State one year to comply with Court's ruling that executive emergency orders delaying transfer of State prisoners were invalid). However, that postponement shall be only temporary to enable the State to take alternative action. Accordingly, we determine that the effective date of our ruling that the State must comply with the three-day transfer regulation shall be sixty days from the date of this decision except that, as to Camden and Hudson Counties, the three-day transfer regulation shall continue to be enforced consistently with this decision.

So ordered.

*For affirmance*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.